UNITED STATES, Appellee,

v.

Private First Class Ken I. CAMANGA,
575–94–8766, United States Army,
Appellant.

ACMR 9100408.

U.S. Army Court of Military Review.

19 May 1992.

For Appellant: Captain Emmett G. Wells, JAGC (argued); Captain James M. Heaton, JAGC (on brief).

For Appellee: Captain Marcus A. Brinks, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Joseph C. Swetnam, JAGC (on brief).

Before CREAN, WERNER, and HAGAN, Appellate Military Judges.

## OPINION OF THE COURT

CREAN, Senior Judge:

The appellant was found guilty, contrary to his pleas, by a military judge sitting as a general court-martial, of larceny of property in excess of $100.00, in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921 (1982) [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for twenty-two months, forfeiture of all pay and allowances, and reduction to Private E1.

In May 1990, the appellant was offered nonjudicial punishment under Article 15, UCMJ, for failing to repair and making a false official statement. On 20 May 1990, there was a fire of suspicious origin in the office of the appellant's battery commander that destroyed, among other things, all records pertaining to the appellant's nonjudicial punishment. Files had been placed on desks and tables throughout the battery headquarters and were connected by toilet paper soaked in an accelerant. The fire was started by ignition of a trail of paper. Though the appellant was the prime suspect in the setting of this fire, there was insufficient evidence to charge him with that offense.

In early August 1990, Private First Class (PFC) H, a soldier assigned to the same installation as the appellant, reported several thousand dollars worth of personal items, including stereo components and compact discs, stolen from his on-post temporary storage locker. There was no sign of forced entry.

On 18 August 1990, there was another suspicious fire this time at the headquarters of the appellant's battalion. Similar to the fire on 20 May 1990, a trail of toilet paper was laid from room to room throughout the battalion headquarters. Additionally, files were piled on desks, soaked with an accelerant, and connected with the toilet paper trail. There were also markings spray painted on the office walls. The fire was ignited by two pipe bombs which had been placed in the battalion commander's office. One of the files destroyed in this fire was the record of appellant's summary court-martial proceedings which had been initiated after the appellant had refused nonjudicial punishment in May.

The appellant was also suspected of setting this fire.

On the day of the fire, agents of the Criminal Investigation Command (CID) looked for the appellant in the battery area, but he could not be located since it was Saturday. However, on the basis of the appellant's poor performance record and his motive (destruction of the nonjudicial punishment and summary court-martial records) to set the fires, the appellant's battery commander permitted the CID agents to search his barrack's room for evidence which might implicate him as the arsonist. The agents discovered a red star cluster signal flare hidden in the ceiling.

Later that evening, the CID agents apprehended the appellant outside his wife's off-post residence [1] and towed his car to the CID office. The car was searched the next day and a receipt for the purchase of pipe, similar to that used in building the incendiary device that started the fire in the battalion headquarters, was found. The CID agents returned the appellant to his unit at approximately 0400 hours on 19 August 1990. The appellant's battery commander ordered the unit charge of quarters (CQ) to inform the appellant that he was to remain in the unit area. However, the appellant left the area. Later that same morning, the battery commander was advised by the CQ that the appellant was not in the unit area. The battery commander advised the CID agents of the appellant's absence from the unit area. When informed of his disappearance, the CID agents went to the appellant's off-post residence, coaxed him by telephone out of the house, and apprehended him. As the appellant was being apprehended, one of the agents noticed two pipes, similar to the pipes found at the scene of the battalion headquarters fire, in the window of appellant's apartment.

During the apprehension of the appellant at his apartment on the morning of 19 August 1990, the CID agents were approached by a neighbor, Mr. Lozano, who informed the agents that, for a fee, he had agreed to store some items belonging to the appellant. The items, which included stereo components and compact discs, were stored in a spare bedroom of Mr. Lozano's house and he wanted to know what to do with them. The agents told Mr. Lozano to hold the items.

Several days later, the agents returned to Mr. Lozano's house to examine the items. The agents were shown a stereo rack system, various components, numerous speakers, a keyboard, cassettes, a television, and a video cassette recorder (VCR). After checking the serial numbers, the agents verified that these were the items reported stolen by PFC H.

On the morning of 23 August 1990, the agents returned to the appellant's off-post residence to learn if his roommate had any information that would be helpful in the investigation. The appellant's roommate, PFC N, permitted the agents to enter the apartment and look in the common areas but not the appellant's personal room. The agents observed two blue milk container crates containing compact discs, similar to the items reported stolen by Private H, in the common area of the apartment.

Later that same day and in conjunction with the Federal Bureau of Investigation (FBI), a warrant was issued by a United States Magistrate Judge to search the appellant's off-post residence. The affidavit from the FBI agent included, as part of the facts used to obtain the warrant, the items seized from the appellant's barracks room and car. The affidavit also detailed the circumstances of the fires and information received from the appellant's roommate, PFC N, that the appellant had brought pipe and paint thinner into the apartment. The warrant listed as seizable only items that could have been used to set the fires, but did not list the blue milk crates and compact discs. The agents executed the warrant on the afternoon of 23 August 1990, and seized a blue milk container crate containing compact discs and other items found in the appellant's room that they believed were stolen from PFC H. At trial, PFC H identified the items as his stolen property.

1. The appellant and his wife were separated and had different off-post residences.

The military judge suppressed all items seized from appellant's barracks room or car and ruled that the first apprehension of the appellant on 18 August 1990 was illegal since the CID agents and unit commander did not have probable cause to believe that the appellant had set either of the fires. Then, over defense objection, the military judge admitted the items obtained from Mr. Lozano. He also admitted the items seized from the appellant's off-post residence on grounds that the warrant issued by the U.S. Magistrate Judge was supported by sufficient information to establish probable cause. Although some of the information used in the magistrate judge's probable cause determination was tainted by the earlier illegal search of appellant's car and barracks room, the military judge found that it did not affect the legality of the warrant. Thereafter, the military judge acquitted the appellant of all the arson charges, but found him guilty of larceny from PFC H.

The appellant asserts two assignments of error. First, he contends that the military judge erred in not suppressing the items provided by Mr. Lozano and those items seized from his off-post residence on grounds that their seizure was tainted by the illegal search of his barracks room and car. We disagree and hold that the military judge properly admitted the items provided by Mr. Lozano and those seized from the appellant's off-post residence.

The second assignment of error asserts that the trial defense counsel erred by not informing the military judge during trial of the appellant's desire to obtain civilian counsel. In effect, this assignment of error asserts ineffective assistance of counsel. We agree that the trial defense counsel erred, but find that his actions did not prejudice the appellant. We will consider the assertion of ineffective assistance of counsel first.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Captain (CPT) W, a counsel from the local Trial Defense Service (TDS) office, was assigned as appellant's counsel almost a year before this trial for an incident totally unrelated to the offenses for which he was eventually tried. Captain W was appellant's counsel when he was initially suspected of the arson offenses that eventually led to his court-martial. Before trial, the appellant tried to obtain civilian counsel. He gave his wife money to pay for a civilian counsel but she used it to pay other bills. At the start of the trial, the military judge advised the appellant of his rights to counsel. UCMJ art. 38(b), 10 U.S.C. § 838(b); Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 502(d)(6) [hereinafter R.C.M.]; *United States v. Donohew,* 39 C.M.R. 149 (C.M.A. 1969). The appellant stated that he understood his rights to counsel and elected to be represented by CPT W.

After the military judge announced the sentence and was advising the appellant of his post-trial appellate rights, CPT W informed the military judge:

Your Honor, just prior to beginning my closing argument on findings, PFC Camanga informed me that he wished to be represented by civilian counsel, therefore, he would request a post-trial session in order to address the issue of a new trial based on a lack of—I· guess, incompetence of counsel, Your Honor, based on PFC Camanga was not allowed his choice of counsel.

The military judge advised the appellant that if he could retain civilian counsel before the record of trial was authenticated, he would consider his request for a new trial.

A post-trial Article 39(a), UCMJ, hearing was held approximately one month after the trial and appellant was represented by civilian counsel. The military judge learned that during the presentation of the defense case, the appellant gave CPT W a note stating that he wanted civilian counsel. The appellant repeated his desires for civilian counsel to CPT W during the sentencing portion of the trial but CPT W essentially ignored the appellant's requests. CPT W stated that he thought the appellant's attempt to hire a civilian counsel was a "dead issue" and he "didn't even

dream in a million years that [the appellant had] enough money to hire civilian counsel. I didn't take his request seriously...."

In his ruling based on the post-trial session, the military judge described how the appellant attempted to delay his command in taking disciplinary and criminal actions against him.[2] The military judge denied the request for a new trial and ruled, in part, that:

The accused was aware of his right to retain civilian counsel at least as early as late August, 1990. The trial of the case was delayed, due to requests by the detailed counsel, from 13 November 1990 until 6 February 1991. On that date, the accused was formally advised of his right to retain civilian counsel, and made no representations to the court that he was anything but satisfied with the detailed counsel. The case was then further delayed, at the government's request but due to the actions of the accused, until 26 February. It is difficult to see what more "fair and reasonable" opportunity the accused could be entitled to, to retain counsel of choice. (Although after the fact, the speed with which the accused did retain counsel, after the trial, certainly supports a conclusion that his pretrial opportunity was entirely sufficient.)

. . . .

Had the detailed counsel alerted the court to the accused's desires for civilian counsel prior to findings, at the time he became aware that the accused still wished such counsel, the issue could have been resolved as a request for a continuance to obtain counsel, rather than a request for a new trial.

. . . .

Had the detailed counsel requested a continuance, on the afternoon of 27 February, the court would, therefore, have been acting entirely reasonably to have denied such a request.

■ The standard for measuring claims of ineffectiveness of counsel is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This standard has been adopted for courts-martial. *United States v. Scott,* 24 M.J. 186 (C.M.A.1987). Under *Strickland,* the appellant must first show that his defense counsel's performance was deficient, and second, the deficient performance prejudiced the defense so as to deprive the appellant of a fair trial. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Scott,* 24 M.J. at 188.

This is not a case where an accused has been denied his fundamental right to counsel. UCMJ art. 38(b); *United States v. Gnibus,* 21 M.J. 1, 5 (C.M.A.1985). The appellant informed the military judge that he was satisfied with his counsel, and he then received able representation in all phases of his trial by his counsel. Our reading of the record of trial leads us to conclude that CPT W's overall representation of appellant was extremely effective. He prevailed in having most of the physical evidence against the appellant suppressed. He won acquittals for the appellant for every offense except one. His performance shows a counsel who had done his homework, was prepared, organized, and fully versed in the factual and legal issues of the case. What is at issue is whether the accused was afforded the opportunity to exercise his right to be represented by

---

2. Even though the military judge acquitted the appellant of the arson charge, he nevertheless found that the appellant set the fire on 20 May 1990 in his battery commander's office to destroy the files on a pending Article 15, UCMJ. On 18 August 1990, the appellant was pending a summary court-martial and he set the fire in his battalion commander's office to destroy the files relating to the summary court-martial. On 20 August 1990, in an attempt to escape custody and avoid any disciplinary action, the appellant jumped from his barracks and had to be hospitalized. The appellant and his family, from May to October 1990, tried to obtain civilian counsel to represent the appellant. On 20 October 1990, the appellant ceased attempts to hire civilian counsel because of lack of funds. The military judge further found the appellant's statements and testimony during the post-trial proceedings to be incredible and obviously tailored more to his own interests than to the truth. He further found that the notation "I want a civilian lawyer to represent me" in the appellant's notes taken during trial, was made by the appellant after trial to support the post-trial motion for a new trial.

civilian counsel of his choice. *See United States v. Potter,* 33 C.M.R. 330 (C.M.A. 1963); *United States v. Evans,* 4 C.M.R. 133 (C.M.A.1952).

■ The trial defense counsel should have advised the military judge of the appellant's request for a change of counsel as soon as the appellant solidified his desires to change counsel. *See,* Dep't of Army, Pam. 27–26, Legal Services: Rules of Professional Conduct for Lawyers, Rules 1.2(a) and 1.3 (31 Dec. 1987). It is not counsel's job to try to talk his client out of a desire to change counsel. His duties are to ensure his client understands his rights to counsel, makes an informed decision, and then communicate his client's desires to the military judge. It is the military judge who will then decide the disposition of the client's request. We find that the failure of CPT W to advise the military judge of the appellant's desire to seek a civilian counsel was error.

The second prong of the *Strickland* and *Scott* test for effectiveness of counsel is whether the appellant was prejudiced by his counsel's error. As the military judge correctly determined in his post-trial findings, the request for a change of counsel made during the argument on findings, would have been treated as a request for a continuance. The decision to grant or deny a continuance rests within the sound discretion of the military judge and will not be overturned except for a clear abuse of that discretion. *United States v. Menoken,* 14 M.J. 10 (C.M.A.1982); *United States v. Dunks,* 1 M.J. 254 (C.M.A.1976); *United States v. Thomas,* 33 M.J. 694 (A.C.M.R. 1991).

■ The military judge found that, if he had been advised of the request for change of counsel when the appellant told CPT W of his desires, he would have denied the request for continuance. Such a denial of a request to change counsel would not have been an abuse of discretion. *United States v. Kinard,* 45 C.M.R. 74 (C.M.A. 1972); *United States v. Perry,* 14 M.J. 856 (A.C.M.R.1982), *pet. denied,* 16 M.J. 135 (C.M.A.1983). A request for a continuance may properly be denied if it is done solely to vex the prosecution. *United States v. Daniels,* 28 C.M.R. 276 (C.M.A.1959); *United States v. Alicea–Baez,* 7 M.J. 989 (A.C.M.R.1979); *Perry,* 14 M.J. at 858.

The military judge's findings of fact concerning the appellant's attempts to delay disposition of the various disciplinary and criminal actions contemplated by his chain of command clearly shows that his request for civilian counsel during argument on findings was not made in good faith, but to vex the prosecution. Accordingly, we find that the appellant was not prejudiced by his counsel's failure to advise the military judge of his request for civilian counsel since the military judge would not have abused his discretion in denying a request for continuance had it been timely made.

## II. SUPPRESSION OF THE EVIDENCE

We now turn to the second assignment of error: whether the military judge erred in failing to suppress the evidence provided by Mr. Lozano (electronic equipment and related components) and the evidence seized from the appellant's off-post residence (compact discs and personal items such as clothing and shoes). The crux of the appellant's argument is that the seizure of these items resulted from the search of his barracks room which the military judge found unlawful; and his subsequent apprehension in front of his off-post residence which the military judge held was tainted by the unlawful search of his barracks room. Therefore, he argues, since the evidence seized from Mr. Lozano and from the off-post residence was derived from the initial illegal search and apprehension, it too should have been suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Manual for Courts-Martial, United States, 1984, Military Rule of Evidence 311(e)(2) [hereinafter Mil. R.Evid.].

■ The applicable law governing the exclusion of tangible evidence is clear. Evidence seized as a result of an unconstitutional search and seizure is subject to exclusion at trial. *Mapp v. Ohio,* 367 U.S.

643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). This "exclusionary rule" applies not only to evidence received as a direct result of an illegal search and seizure, but also to evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *Wong Sun*, at 488, 83 S.Ct. at 417. This rule is equally applicable in the military. *United States v. Ezell*, 6 M.J. 307, 315 (C.M.A.1979); Mil.R.Evid. 311(a).

### a. The Lawfulness of Appellant's Apprehension

The appellant asserts that his apprehension by CID on the morning of 19 August 1990 at his off-post residence was unlawful because the CID agents apprehended him for breaking an unlawfully imposed restriction. He contends that his battery commander did not have probable cause to restrict him since there was not sufficient evidence to believe that he started the fires. We hold that the apprehension of the appellant at his off-post residence by the CID was lawful.

██ The appellant was suspected of committing a serious offense. He was returned to his unit at 0400 hours in the morning. Under these circumstances, the battery commander was justified in ordering the appellant to remain in the unit area until he could determine whether to take further investigative or disciplinary action. The appellant had a duty to obey that order from his commander. Accordingly, we find that the restriction was lawfully imposed.

The appellant alternatively asserts that even if the restriction order was lawful, the apprehension was nevertheless unlawful as the CID's real reason for apprehending him was the arson offense. Since the evidence connecting appellant to this offense was obtained as a result of the illegal search of his barracks room, the apprehension is tainted. Underlying the appellant's argument is the fact that the CID does not normally apprehend soldiers for breaking restriction.

While the CID does not normally apprehend soldiers who break restriction, that fact does not preclude them from doing so when they have probable cause to believe the apprehendee has committed an offense under the UCMJ. Military law enforcement officials have the authority to apprehend persons subject to the UCMJ. R.C.M. 302(b)(1). Since the CID had probable cause to apprehend the appellant, we find that his apprehension was lawful. Therefore, the items Mr. Lozano provided the CID agents were lawfully seized and correctly admitted into evidence.

### b. The Receipt of Evidence from Mr. Lozano

██ Assuming, *arguendo*, that the apprehension was unlawful, we still find that the items were lawfully seized and admitted into evidence. Merely because an initial search and seizure of evidence is unlawful does not *per se* preclude the admission of any evidence subsequently obtained. The inadmissibility of subsequently seized evidence depends on whether there is a nexus between the unlawful activity and the seizure. Mil.R.Evid. 311(e). Once the evidence has established that the government initially acted unlawfully, the burden then rests with the government to prove, by a preponderance of the evidence, that the causal connection between the illegal activity and the subsequent seizure was broken, remote, or insubstantial. This may be accomplished by showing the existence of an independent source, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *United States v. Peurifoy*, 48 C.M.R. 34 (C.M.A.1973); attenuation, *Wong Sun*, 371 U.S. at 491, 83 S.Ct. at 419; or that the evidence would have been inevitably discovered, *United States v. Kozak*, 12 M.J. 389 (C.M.A.1982).

The record demonstrates that Mr. Lozano was not induced to deliver the goods to the CID agents because of any illegal activity by the agents. His apparent motivation was to inform governmental agents of the existence of the items and relieve himself

of the responsibility for them. Although Mr. Lozano informed the CID agents of the items at the same time as the apprehension, we conclude that Mr. Lozano was not acceding to the authority of the agents. Accordingly, we hold that the causal connection between the illegal search and subsequent apprehension of the appellant and the turning over of the items by Mr. Lozano was insubstantial.

■ Additionally, we agree with the military judge's determination that the appellant did not have a reasonable expectation of privacy in the items that were stored with Mr. Lozano. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court of the United States held that an individual, who had neither a property nor possessory interest in the place searched, did not have an expectation of privacy in that area. *Id.* at 148, 99 S.Ct. at 433. In *Rakas*, the petitioners were stopped by the police as suspects in a robbery. Upon searching the car, the police found a box of shells in the glove compartment and a sawed-off rifle under the front seat. The petitioners neither owned the car nor would assert ownership over the rifle or the shells, but tried to suppress the search as a violation of their fourth amendment rights. *Id.* at 129–30, 99 S.Ct. at 423. The Court held that, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Id.* at 133–34, 99 S.Ct. at 425 (citations omitted). The Court further held that, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his fourth amendment rights infringed." *Id.* at 134, 99 S.Ct. at 425 (citing *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969)).

In the instant case, the appellant had neither a property nor possessory interest in either the items stored with Mr. Lozano or the premises on which they were located, i.e. Mr. Lozano's house. Since Mr. Lozano gave the CID permission to come into

his house and seize the items, the appellant has no standing to complain of Mr. Lozano's actions. Accordingly, under the holding of *Rakas*, we are also of the opinion that the appellant's lack of expectation of privacy furnished the military judge an additional ground for denying the appellant's motion to suppress those items.

### c. The Seizure of Evidence From Appellant's Apartment

■ We find that the items seized from appellant's apartment during execution of the search warrant were properly admitted into evidence by the military judge. An affidavit accompanying a request for a warrant must establish probable cause for a search and seizure. *United States v. Tate*, 694 F.2d 1217 (9th Cir.1982). To determine the validity of the warrant, the court is limited to the information known to the magistrate. *United States v. Cunningham*, 11 M.J. 242 (C.M.A.1981). The scope of the search is limited to the confines of the warrant, but evidence found during a search within the confines of the warrant need not be ignored. *United States v. Thompson*, 33 M.J. 218 (C.M.A. 1991).

The FBI and CID agents entered the appellant's off-post residence on 23 August 1990 to execute a warrant from the U.S. Magistrate Judge. The affidavit supporting the request for the search warrant not only listed evidence of the items seized from the appellant's barracks room and car (later ruled inadmissible by the military judge), but also information on how the fires in the battalion headquarters were started, and information from the appellant's roommate that the appellant brought into the apartment pipe and paint thinner similar to the items used to start the fires. The affidavit provided the issuing magistrate with information that the appellant had a motive, and means, for setting the fires. The military judge was correct in ruling that the U.S. Magistrate Judge had sufficient probable cause to determine that evidence of criminal activity could be found in the appellant's off-post residence and issue the warrant. Accordingly, the agents properly seized the compact discs in the

blue milk crates and the military judge was correct in admitting them into evidence.

 Assuming, *arguendo*, that the search warrant was invalid, we still find that the seizure of the items should not be suppressed in this instance. The seized items were obtained as a result of the CID and FBI agents acting "reasonably and with good faith" upon the issuance of a search warrant by a neutral magistrate. Mil.R.Evid. 311(b)(3)(C).

This limited "good faith" exception to the exclusionary rule was established by the Supreme Court of the United States in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon*, police officers obtained a warrant to search for drugs based on a tip by an informant. Although the warrant seemed valid on its face, it was later found defective for lack of probable cause. The Court held that "the officers' reliance on the magistrate's determination was objectively reasonable, an application of the extreme sanction of exclusion is inappropriate." *Id.* at 926, 104 S.Ct. at 3422. The underlying rationale of *Leon* is that the exclusionary rule is designed to deter police misconduct, and that purpose is not advanced when the police act in good faith reliance on a magistrate's determination of probable cause. The principles set forth in *Leon* have been incorporated into courts-martial in both the Military Rules of Evidence 311(b)(3)(C) and in case law. *See United States v. Morris*, 28 M.J. 8 (C.M.A.1989); *United States v. Brothers*, 30 M.J. 289 (C.M.A.1990); *United States v. Thompson*, 30 M.J. 577 (A.C.M.R.1990); *United States v. Lopez*, 32 M.J. 924 (A.F.C.M.R.1991).

In the present case, the CID and FBI agents relied on a search warrant that was issued by a neutral and detached U.S. Magistrate Judge. The warrant was not facially vague or illegal and we find that the agents that executed the warrant acted in objectively good faith. Therefore, even if the search warrant is invalid in this case, this does not involve police misconduct which is what the fourth amendment exclusionary rule is designed to prevent. Ac-

cordingly, we hold that the evidence seized need not be suppressed, and further hold that it was properly admitted at trial.

We have carefully considered the other assignments of error personally raised by the appellant, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them without merit.

The findings of guilty and the sentence are affirmed.

WERNER and HAGAN * concur.